**FEDERAL PANTS, INC., & Harold Foonberg,**
**Plaintiffs-Appellants-Cross-Appellees,**

v.

**Daniel STOCKING, et al.,**
**Defendants-Appellees-Cross-Appellants.**

**Nos. 84–1690, 84–1745.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1985.

Decided May 22, 1985.

Arthur M. Moglowsky, Bass, Goldstein, Moglowsky & Stein, Milwaukee, Wis., for plaintiffs-appellants-cross-appellees.

Michael A. Bowen, Foley & Lardner, Milwaukee, Wis., for defendants-appellees-cross-appellants.

Before CUMMINGS, Chief Judge, and BAUER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

The plaintiffs Federal Pants, Inc. and Harold Foonberg brought this diversity action against the defendants Daniel Stocking, D–S Enterprises, and others, alleging that the defendants breached an agency

agreement, engaged in unauthorized competition, and misused confidential information. The defendants counterclaimed against the plaintiffs, alleging breach of contract, tortious interference with advantageous economic relations, and unlawful restraint of trade. The district court granted the defendants' motion for summary judgment in part, thereby dismissing all of the plaintiffs' claims, awarding the defendants $79,531.20 on their breach of contract claim, and dismissing the defendants' remaining two claims. For the reasons stated below, we affirm.

## I.

The plaintiffs Federal Pants, Inc. and its sole stockholder Harold Foonberg (collectively referred to as "Federal Pants") and the defendants D–S Enterprises and its partners (collectively referred to as "D–S Enterprises") were each engaged in the diversion business when the events leading up to this lawsuit transpired. This business involves acquiring well-known, name-brand products from a manufacturer and reselling the merchandise to discount stores and other outlets that have not been designated as authorized dealers by the manufacturer. D–S Enterprises had obtained the right to buy sports shoes and other athletic apparel from the Nike Corporation. Federal Pants, however, was not an authorized Nike dealer and thus could not purchase goods directly from Nike.

In May 1982, D–S Enterprises placed future delivery orders with Nike in the sum of several hundred thousand dollars or more each month for the period from June 1982 through January 1983. When D–S Enterprises found in June 1982 that it could not on its own post the security of $1 million required by Nike to guarantee the future delivery orders, it negotiated with Federal Pants to combine resources. Federal Pants was to post a $1 million letter of credit for the benefit of The Standard Chartered Bank Limited of Chicago. The Standard Chartered Bank would then post a back-to-back $1 million letter of credit for the benefit of Nike. On June 23, 1982, Jay

Foonberg, the brother of and attorney for the president of Federal Pants, sent D–S Enterprises an agreement stating that Federal Pants was to guarantee up to $1 million in D–S Enterprises' purchases from Nike while D–S Enterprises would resell these purchases to Federal Pants or to persons designated by Federal Pants. On behalf of D–S Enterprises, Daniel Stocking and his wife signed the agreement and returned it to Federal Pants.

For a period of two months, D–S Enterprises purchased over $1 million in Nike merchandise and resold it to Federal Pants or to another buyer designated by Federal Pants. D–S Enterprises never drew on Federal Pants' letter of credit, but rather paid Nike directly for all of its purchases.

In late August or early September 1982, Nike discovered that D–S Enterprises was reselling Nike merchandise to an unauthorized wholesaler and immediately terminated the future delivery orders contract. In September, D–S Enterprises informed Federal Pants of Nike's decision to terminate the orders and proceeded to sue Nike for breach of a dealership agreement under the Wisconsin Fair Dealership Act. In November 1982, Nike began settlement negotiations with D–S Enterprises. Nike offered to make a one-time, final sale to D–S Enterprises of $8 million worth of shoes that Nike had on hand. Nike insisted that D–S Enterprises would have to secure the sale with a letter of credit or other security in the amount of the sale plus the amount that D–S Enterprises still owed to Nike. Nike refused to allow D–S Enterprises to rely on Federal Pants' $1 million letter of credit, required D–S Enterprises to post a new letter of credit before the settlement sale, and insisted that delivery on the sale begin by the end of November 1982.

Throughout November, D–S Enterprises attempted to find immediate buyers for the Nike merchandise in order to raise the necessary financing. Federal Pants contacted D–S Enterprises and demanded that the Nike merchandise be sold to it. D–S Enterprises offered to sell $3.2 million worth of merchandise to Federal Pants if it would

put up a letter of credit in that amount. Federal Pants did not have enough credit to obtain a letter of credit for $3.2 million. D–S Enterprises proceeded to sell the Nike merchandise to two buyers who committed to post letters of credit in the requisite amounts before the deadline imposed by Nike. At the end of November 1982, Federal Pants proceeded to stop payment on a $79,531.20 check that it had sent to D–S Enterprises in payment for goods already received. Federal Pants also filed this lawsuit against D–S Enterprises.

In its complaint, Federal Pants alleged four causes of action: (1) D–S Enterprises' breach of an agency agreement with Federal Pants under which D–S Enterprises was to act as Federal Pants' purchasing agent in obtaining Nike goods, (2) D–S Enterprises' breach of an exclusive agency agreement under which D–S Enterprises agreed to obtain Nike goods exclusively for Federal Pants, (3) D–S Enterprises' unauthorized use of confidential information and unauthorized competition, and (4) D–S Enterprises' breach of its contract with Federal Pants. In its counterclaim to plaintiffs' suit, D–S Enterprises alleged: (1) Federal Pants' breach of its sales contract with D–S Enterprises by stopping payment on the $79,531.20 check that it had issued to D–S Enterprises, (2) Federal Pants' tortious interference with advantageous economic relations between D–S Enterprises and its bank as a result of the stop payment order, and (3) an unlawful restraint of trade under the Sherman Act. On D–S Enterprises' motion for summary judgment, the district court dismissed the plaintiffs' four causes of action and the defendants' second and third counterclaims. The district court granted D–S Enterprises' motion for summary judgment on its first counterclaim and awarded D–S Enterprises $79,531.20 for goods that Federal Pants had purchased from it. On appeal, the plaintiffs continue to claim that D–S Enterprises was not free to sell the Nike settlement goods to other buyers, but rather had an obligation to buy goods on Federal Pants' behalf.

## II.

### A. Agency Relationship between Federal Pants and D–S Enterprises

In its complaint, Federal Pants alleged that D–S Enterprises had breached an exclusive agency agreement or merely an agency agreement with Federal Pants under either of which D–S Enterprises was to act as Federal Pants' purchasing agent in obtaining Nike goods. In addressing this allegation, the district court noted that there was not much evidence presented on the existence of an agency relationship and that even if such a relationship existed, it did not survive Nike's termination of D–S Enterprises as an authorized dealer. Furthermore, the district court noted that even if D–S Enterprises had an obligation to offer to Federal Pants the merchandise that it had acquired in its settlement negotiations with Nike, D–S Enterprises did not have to decline to accept this merchandise when Federal Pants was unable to finance the settlement.

■ According to the Restatement (Second) of Agency, an agency relationship is the "fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958); *Krueger v. State*, 39 Wis.2d 729, 732, 159 N.W.2d 597, 599 (1968). An element of the agency relationship is the understanding of the parties that the principal is to be in control of the undertaking and that the agent shall serve as a fiduciary subject to the directions of the principal. Restatement (Second) of Agency § 1 comment b; *Alexopoulos v. Dakouras*, 48 Wis.2d 32, 40, 179 N.W.2d 836, 840 (1970). In addition to generally defining an agent, the Restatement (Second) distinguishes an agent from a supplier: "one who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself." Restatement (Second) of Agency § 14K. The Restatement (Second)

enumerates several factors relied upon in determining whether the one who is to acquire the property and transfer it to the other is a supplier selling to, and not acting as an agent for, the other: (1) whether the person is to receive a fixed price for the property, irrespective of the price paid by him (the most important factor); (2) whether the person acts in his own name and receives title to the property which he thereafter is to transfer; and (3) whether the person has an independent business in buying and selling similar property. *Id.* comment a.

■ In the present case, there are several facts suggesting that an agency relationship did exist between Federal Pants and D–S Enterprises.[1] The June 23, 1982 letter evidencing the agreement between Federal Pants and D–S Enterprises provided that "Federal Pants, Inc. and Harold Foonberg are guaranteeing up to One Million Dollars (1,000,000.00) of purchases of D–S Enterprises, Inc. from Nike. These are purchases which may be re-sold by D–S Enterprises to Federal Pants, or to such persons designated by Federal Pants." Although it provides some evidence of an agency relationship, this provision does not clearly establish an agency relationship because it might equally be describing a supplier relationship. However, in applying the agent-supplier criteria set forth in the Restatement (Second), it appears that D–S Enterprises might have been Federal Pants' agent since D–S Enterprises was to receive a fixed 5% commission for the Nike merchandise sold to Federal Pants. This factor is the most important one in determining whether an individual is serving as an agent or a supplier according to the Re-

statement (Second). As to the second factor of the Restatement (Second) test, D–S Enterprises did not act in its own name or in Federal Pants' name, but rather booked and billed the orders to Gary DuPuis of Performance Sports. Thus, this element does not operate to the benefit of either D–S Enterprises or Federal Pants. Finally, as to the third factor, although D–S Enterprises operated out of Stocking's law firm, had no employees, office, or equipment of its own, and did not appear in any professional directories, it did have an independent business since it booked goods for Western Mercantile in addition to Federal Pants. Thus, based on the fact that D–S Enterprises received a fixed commission, we conclude that an agency relationship may have existed between Federal Pants and D–S Enterprises.

■ Even if D–S Enterprises was Federal Pants' purchasing agent for Nike merchandise, however, the agency relationship came to an end when Nike terminated D–S Enterprises' dealership rights after discovering that D–S Enterprises was selling Nike goods to Federal Pants, an unauthorized dealer, in late August or early September 1982. According to the Restatement (Second), the authority of an agent terminates when he receives notice of the happening of an event or of a change in circumstances from which he should reasonably infer that the principal does not consent to the further exercise of authority or would not consent if he knew the facts. Restatement (Second) of Agency § 108(1) (1958). In addition, an agent has the duty to use reasonable efforts to give to his principal information relevant to affairs entrusted to the agent. *Id.* § 381; *Schweiger*

---

**1.** Even though we find that there are several facts pointing to the existence of an agency relationship between Federal Pants and D–S Enterprises, we note that their relationship was not exclusive as Federal Pants alleged since D–S Enterprises was also booking business for another wholesaler, Western Mercantile.

In the third count of its counterclaim, D–S Enterprises claimed that if the court found that D–S Enterprises and Federal Pants were parties to an exclusive agency agreement, then the court should find that Federal Pants engaged in

an unlawful restraint of trade in violation of the Sherman Act. 15 U.S.C. § 1 (1982). D–S Enterprises reasoned that if it had an exclusive agency relationship with Federal Pants, then Federal Pants would have been tying credit to an unreasonably overbroad refusal to deal with competitors. Since we find that D–S Enterprises and Federal Pants were not parties to an exclusive agency relationship, we affirm the district court's dismissal of D–S Enterprises' third counterclaim alleging an unlawful restraint of trade.

*v. Loewi and Co.*, 65 Wis.2d 56, 64, 221 N.W.2d 882, 888 (1974). In the present case, D–S Enterprises notified plaintiff Foonberg of Nike's termination of D–S Enterprises as an authorized Nike dealer in September 1982. Upon receipt of the notice, Federal Pants did not instruct D–S Enterprises to sue Nike for Federal Pants' own benefit. In fact, Federal Pants did not respond in writing to this notification until November 23, 1982, when it sent a letter to D–S Enterprises. Furthermore, this November 23 letter attempted to formally wind up Federal Pants' relationship with D–S Enterprises by requesting that Federal Pants' $1 million letter of credit be exonerated since D–S Enterprises no longer needed it. The letter also suggested that D–S Enterprises send a release of mortgage form to Federal Pants since Federal Pants would no longer need any security for its posting the letter of credit. The letter did not indicate that Federal Pants believed that D–S Enterprises had breached any fiduciary duties to Federal Pants, but rather concluded by thanking defendant Stocking for his "courtesy and cooperation." In sum, Federal Pants' response upon learning of Nike's termination and its November 23 letter show that any agency relationship that may have existed between Federal Pants and D–S Enterprises came to an end when Nike terminated D–S Enterprises as an authorized Nike dealer. Thus, any Nike merchandise received by D–S Enterprises pursuant to the settlement negotiations with Nike was obtained for its own rather than for Federal Pants' benefit. We accordingly affirm the district court's denial of plaintiffs' motion for summary judgment on the agency counts.

## B. Breach of Contract

In addition to its agency causes of action, Federal Pants alleged that D–S Enterprises breached its contract to sell Nike merchandise to Federal Pants in exchange for Federal Pants furnishing a $1 million letter of credit to finance the purchases. D–S Enterprises counterclaimed with its own breach of contract claim as a result of Federal Pants' issuance of a stop payment order on a $79,531.20 check that it had issued to D–S Enterprises in payment for Nike goods already received. The district court found that D–S Enterprises had always met its obligation to provide Nike merchandise to Federal Pants and had actually rendered over $1 million in goods to Federal Pants when Nike terminated its relationship with D–S Enterprises. The court concluded that any contract between the parties was premised on the ongoing relationship of D–S Enterprises with Nike and that when that relationship ended, the contract between Federal Pants and D–S Enterprises lapsed. The court noted that even if the contract survived Nike's termination, D–S Enterprises was not obliged to forego purchasing the Nike settlement goods and reselling them to other customers in view of Federal Pants' inability to finance the purchase. The court also concluded that Federal Pants was obligated to pay for the $79,531.20 worth of goods that it had received from D–S Enterprises since D–S Enterprises never drew on Federal Pants' letter of credit or breached any contract with Federal Pants.

Federal Pants argues that D–S Enterprises was under a duty to notify Federal Pants of its lawsuit against Nike and to turn over its legal rights against Nike to Federal Pants pursuant to section 2–615 of the Uniform Commercial Code ("U.C.C."). According to section 2–615(1), a seller will not be considered to have breached his duty under a sales contract due to delay in delivery or nondelivery in whole or in part if "performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." Wis.Stat. § 402.615(1) (1983–1984). This section also provides that the seller must notify the buyer seasonably that there will be a delay or nondelivery. *Id.* § 402.615(3). Comment five to this section states that when there is a failure of production by an agreed source of supply, the seller must act in good faith in making good his claim of excuse by turning over to the buyer his rights against the defaulting

source of supply to the extent of the buyer's contract. *Id.* § 402.615 comment 5. Following the seller's notification to the buyer concerning a material or indefinite delay or an allocation, the buyer may be written notification to the seller terminate and discharge any unexecuted portion of the contract or else modify the contract by agreeing to take his available quota in substitution. *Id.* § 402.616(1). If the buyer fails to modify the contract within a reasonable time not exceeding thirty days following receipt of the seller's notification, the contract will lapse with respect to any deliveries affected. *Id.* § 402.616(2). According to the comment, this section is designed to establish simple and workable machinery for providing certainty when a supervening contingency excuses the delay or discharges the contract. *Id.* § 402.616 comment.

■ In the present case, D–S Enterprises complied with the relevant provisions of the Uniform Commercial Code and thus did not breach its sales contract with Federal Pants. Nike's termination of D–S Enterprises as an authorized dealer constituted a contingency the nonoccurrence of which was a basic assumption on which the contract between D–S Enterprises and Federal Pants was made. D–S Enterprises' failure to deliver the Nike merchandise to Federal Pants following Nike's termination did not amount to a breach of D–S Enterprises' duty to deliver goods to Federal Pants pursuant to their sales contract because the occurrence of this contingency made D–S Enterprises' performance impracticable. Following Nike's termination, D–S Enterprises notified Federal Pants of the nondelivery. Federal Pants never instructed D–S Enterprises to sue Nike on its behalf. Furthermore, Federal Pants failed to modify its contract with D–S Enterprises within thirty days of receiving D–S Enterprises' notification and remained silent for two months until its November 23 letter to D–S Enterprises. Federal Pants' failure to respond to D–S Enterprises thus resulted in the lapsing of its contract with D–S Enterprises under section 2–616(2) of the U.C.C. This termination of the contract between

D–S Enterprises and Federal Pants was essentially acknowledged by Federal Pants in its November 23 letter to D–S Enterprises when it requested the return of its letter of credit. *Cf. Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 989 n. 91 (5th Cir.1976) (buyer's failure to pursue options under U.C.C. § 2–616 would not preclude him from maintaining a breach of contract action because both the buyer and seller continued to perform the contract as though it remained in force following the occurrence of the contingency).

In sum, D–S Enterprises was excused from performing its obligations to Federal Pants under the terms of their sales contract as a result of Nike's unexpected termination. Federal Pants' silence following D–S Enterprises' notice of Nike's termination resulted in the contract being discharged. Since we find that D–S Enterprises neither breached its contract with Federal Pants nor improperly used Federal Pants' $1 million letter of credit, Federal Pants must pay D–S Enterprises for the $79,531.20 worth of Nike goods that it received. Thus, we affirm the district court's grant of summary judgment on D–S Enterprises' counterclaim and the court's denial of Federal Pants' motion on its breach of contract claim.

**C. Misuse of Confidential Information, Unauthorized Competition, and Tortious Interference with Advantageous Economic Relations**

In its final cause of action, Federal Pants claimed that D–S Enterprises misused confidential information in selling the Nike settlement goods to Federal Pants' principal customers and engaged in unauthorized competition in using Federal Pants' own $1 million letter of credit to enable D–S Enterprises to purchase goods for and sell directly to Federal Pants' customers. According to the Restatement (Second) of Agency, an agent is subject to a duty not to compete with his principal concerning the subject matter of his agency. Restatement (Second) of Agency § 393 (1958); *McGeoch*

*Building Co. v. Dick and Reuteman Co.*, 253 Wis. 166, 173, 33 N.W.2d 252, 255 (1948). This duty not to compete, however, ceases upon the termination of the agency relationship. Restatement (Second) of Agency § 393 comment e, § 396(a); *Stark and Co. v. Roets*, 3 Wis.2d 612, 615, 89 N.W.2d 189, 191 (1958). Although prohibited from using trade secrets or other confidential information given to him only for the principal's use, an agent is permitted to use general information concerning the principal's method of business and the names of customers retained in the agent's memory, if not acquired in violation of his duty as an agent. Restatement (Second) of Agency § 396(b). *See also Corroon and Black-Rutters and Roberts, Inc. v. Hosch*, 109 Wis.2d 290, 325 N.W.2d 883 (1982) (not unfair competition for an insurance agent to use his former employer's customer lists to direct clients to the agent's new insurance agency); *American Welding and Engineering Co. v. Luebke*, 37 Wis.2d 697, 155 N.W.2d 576 (1968) (not unfair competition for an individual to take cards containing customer names and addresses from his former employer when any person possessing similar knowledge of the industry could have compiled such a file by recalling past experiences and by referring to trade manual directories).

▪ In this case, the agency or contractual relationship between D–S Enterprises and Federal Pants terminated before D–S Enterprises and Nike had reached their settlement agreement and before D–S Enterprises had attempted to find buyers for the Nike settlement goods. Since the relationship between D–S Enterprises and Federal Pants had already terminated, D–S Enterprises was free to solicit Federal Pants' former customers.

Furthermore, D–S Enterprises offered to sell $3.2 million worth of settlement goods to Federal Pants if Federal Pants was able to finance the purchase. Nike had specifically conditioned the settlement agreement with D–S Enterprises on D–S Enterprises' ability to secure the total amount of the settlement purchase with new letters of credit, rather than with Federal Pants' $1 million letter of credit, and on the assumption that the financing and other details would be negotiated in time for shipment to begin by November 30, 1982. According to the terms of Federal Pants' $1 million letter of credit, the letter was only to be drawn upon if D–S Enterprises' payment on a Nike invoice was sixty days past due. Since the $1 million letter of credit expired on January 21, 1983, Federal Pants' letter could only be applied to purchases made sixty days before that expiration date. Thus, in order for D–S Enterprises to have been able to use Federal Pants' letter of credit to finance the settlement goods, the payment for those goods would have had to have been due on or before November 22, 1982, sixty days before the letter's expiration. Since the settlement transaction required D–S Enterprises to accept delivery any time after November 30, 1982, D–S Enterprises could not have and actually did not rely on Federal Pants' $1 million letter of credit to finance the transaction. In sum, since D–S Enterprises was free to solicit Federal Pants' customers and since D–S Enterprises did not use Federal Pants' own letter of credit to compete against Federal Pants, the district court's denial of Federal Pants' motion for summary judgment on its misuse of confidential information and unauthorized competition claims should be affirmed.

In addition to its breach of contract and restraint of trade claims, D–S Enterprises also counterclaimed for tortious interference by Federal Pants with D–S Enterprises' advantageous economic relations with its bank, the Marine Bank. D–S Enterprises argues that Federal Pants' stop payment order on its check to D–S Enterprises was the cause for the bank's disruption of its business relationship with D–S Enterprises. The district court granted Federal Pants' motion to dismiss this counterclaim, finding no support for it in the record.

▪ The Wisconsin Supreme Court has long recognized a right of action for tortious interference with advantageous economic relations and has referred to the

elements outlined in the Restatement of Torts in defining this cause of action. *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F.Supp. 1216, 1221 (E.D.Wis.1975), *aff'd*, 549 F.2d 804 (7th Cir. 1977). The court has held that one who, without a privilege to do so, induces or otherwise purposely causes a third person not to perform a contract or not to enter into or continue a business relationship with another shall be liable to the other for the harm caused by this action. *Id.* Once the plaintiff has proved intentional interference with existing contractual relations, the burden of proving the justification for such interference is upon the defendant. *Id.* According to the Restatement of Torts, a court should examine the following factors in order to determine if the defendant's interference was privileged: (1) the nature of the defendant's conduct, (2) the nature of the expectancy with which his conduct interferes, (3) the relations between the parties, (4) the interest sought to be advanced by the defendant, and (5) the social interests in protecting the expectancy on the one hand and the defendant's freedom of action on the other hand. Restatement of Torts § 767 (1939); *Landess v. Borden, Inc.*, 667 F.2d 628, 631 (7th Cir.1981). In each case, a court must decide whether, upon consideration of the relative significance of the five factors, the defendant's conduct should be permitted despite its expected effect of harm to another. Restatement of Torts § 767 comment a.

In this case, we conclude that even assuming that D–S Enterprises stated a cause of action for tortious interference with its business relations with the Marine Bank, Federal Pants has shown that any interference due to its issuance of the stop payment order was justified. On November 22, 1982, D–S Enterprises deposited the $79,531.20 check from Federal Pants into its bank account. On November 23, 1982, Federal Pants sent a letter to D–S Enterprises requesting that Federal Pants' $1 million letter of credit be exonerated since D–S Enterprises would no longer be needing the letter. However, Federal Pants also learned at this time that D–S Enterprises had entered into a settlement with Nike and that D–S Enterprises was actively seeking financing for $8 million in settlement goods. In view of D–S Enterprises' need to find the requisite financing in a short period of time, Federal Pants could have justifiably believed that D–S Enterprises might use Federal Pants' $1 million letter of credit without its consent. In addition, at that point, Federal Pants also might have believed that it had an interest in the settlement goods since D–S Enterprises had previously made all of its purchases from Nike on the strength of Federal Pants' letter of credit. In sum, we affirm the district court's dismissal of D–S Enterprises' tortious interference counterclaim.

In conclusion, we affirm the district court's dismissal of all of Federal Pants' claims and of D–S Enterprises' tortious interference and restraint of trade counterclaims. We also affirm the court's decision to award judgment in favor of D–S Enterprises on its breach of contract claim and to order Federal Pants to pay $79,531.20 to D–S Enterprises.